## SANTA FE LAKE DWELLERS ASSOCIATION v STATE OF FLORIDA, DEPARTMENT OF ENVIRONMENTAL REGULATION

### Case No. 85-4446

State of Florida, Division of Administrative Hearings

April 8, 1987

### APPEARANCES OF COUNSEL

**Timothy Keyser** for petitioner.

**Robert S. Griscti, Turner, Kurrus & Griscti,** for petitioner.

**Bradford L. Thomas,** Assistant General Counsel, Department of Environmental Regulation, for respondent.

**Richard S. Brightman** and **Frank E. Matthews, Hopping, Boyd, Green & Sams,** for intervenor, Santa Fe Pass, Incorporated.

## OPINION OF THE COURT

ROBERT T. BENTON, II, Hearing Officer.

This matter came on for hearing in Gainesville, Florida, on September 2, 1986. After it became clear that a second day would be necessary to finish the hearing, the parties agreed to a continuance of the hearing until a later time, rather than going forward the following day; and the hearing reconvened on October 13, 1986. Transcript references begin with the initial of the month in which the hearing day fell. The transcript of proceedings was filed with the Division of Administrative Hearings on November 18, 1986. In agreeing to take twenty days for proposed recommended orders, the parties waived the time requirements of Rule 28-5.402, Florida Administrative Code, in accordance with Rule 22I-6.31(2), Florida Administrative Code.

Originally, the Department of Environmental Regulation (DER) issued a notice of intent to grant the application Santa Fe Pass, Inc. (SFP) filed for a permit to construct a wastewater treatment facility. (T.17). By the time the hearing began, however, DER had withdrawn its notice of intent to grant and substituted a notice of intent to deny. Then, on December 8, 1986, the Joint Proposed Recommended Order of Respondents Department of Environmental Regulation and Santa Fe Pass, Inc. was filed, reflecting the most recent change in DER's position.

Although the parties' agreed deadline for filing proposed recommended orders was December 8, 1986, Santa Fe Lake Dwellers Association (Association) filed its proposed recommended order on December 10, 1986. By order entered December 31, 1986, SFP's motion to strike the Association's proposed recommended order, on the grounds that it was filed two days late, was denied. The parties' proposed fact findings are treated by number in Appendix B.

The parties are represented by counsel.

The circumstances under which the Association gained the right to be heard on SFP's application for a permit to construct a wastewater treatment and disposal facility are set out in the order denying motion to dismiss entered April 14, 1986, attached to the recommended order as Appendix A. All conclusions of law reached in Appendix A are incorporated into the recommended order.

### ISSUES

Whether SFP's revised application for a permit to construct a sewage

164

treatment plan with percolation ponds should be granted or, for failure of SFP to give reasonable assurances that the plant will not cause pollution significantly degrading the waters of Gator Cove, be denied?

## FINDINGS OF FACT

1. About 1,500 feet from Santa Fe Lake's Gator Cove, SFP proposes to build an extended aeration package sewage treatment plant to serve a "private club with restaurant and overnight accomodations," SFP's Exhibit No. 1, to be built between the plant and the lake, on the western shore of Santa Fe Lake, just sought of the strait or pass connecting Santa Fe Lake and Little Santa Fe Lake.

2. The site proposed for the waste water treatment plant lies at approximately 177 or 178 feet above sea level, north of Earleton on county road N.E. 28 near State Road 200A, some three miles north of State Road 26, in unincorporated Alachua County, Section 33, Township 8 South, Range 22 East. SFP's Exhibit No. 1.

3. Santa Fe Lake, also called Lake Santa Fe, and Little Santa Fe Lake, also called Little Lake Santa Fe, are designated outstanding Florida waters by rule. Rule 17-3.041(4)(i), Florida Administrative Code. Lake Santa Fe "is . . . the sixth largest non-eutrophic lake in the State of Florida . . . [and] the last remaining large non-eutrophic lake in Alachua County." (0.367). Recreation is a "beneficial use" of these waters. The Lakes Santa Fe are at an elevation of approximately 140 feet above sea level, and their level varies within a range of four feet.

### Input

4. The proposed plant is to treat sewage generated by staff, by diners at a 150-seat restaurant, and by inhabitants of 150 lodge or motel rooms, comprising 100 distinct units. On the assumptions that 150 rooms could house 275 persons who would generate 75 gallons of sewage a day for a daily aggregate of 20,625 gallons, and that a 150-seat restaurant would generate 50 gallons of sewage per seat per day, full occupancy is projected to engender 28,125 gallons of sewage per day. This projection is based on unspecified "D.E.R. criteria" (S.35) which the evidence did not shown to be unreasonable.

5. Full occupancy is not foreseen except around the Fourth of July, Labor Day and on other special occasions. An annual average flow of between 15 and 20,000 or perhaps as low as 13,000 gallons per day is envisioned. (S.38) The proposed plant is sized at 30,000 gallons per day in order to treat the peak flow forecast and because package plants are designed in 5,000 gallon increments. Sluice-gate valves and baffling are

to permit bypassing one or more 5,000 gallon aeration units so plant capacity can be matched to flow.

6. The composition of the sewage would not be unusual for facilities of the kind planned. As far as the evidence showed, there are no plans for a laundry, as such, and "very little laundry" (S.37) is contemplated. The health department would require grease traps to be installed in any restaurant that is built.

7. Gravity would collect sewage introduced into 2,000 feet of pipe connecting lodging, restaurant and a lift station planned (but not yet designed) for construction at a site downhill from the site proposed for the water treatment plant. All sewage reaching the proposed treatment plant would be pumped 3,000 feet from the lift station through a four-inch force main. Influent flow to the treatment plant could be calculated by timing how long the pump was in operation, since it would "pump a relatively constant rate of flow." (S.39)

### Treatment

8. Wastewater entering the plant would go into aeration units where microorganisms would "convert and dispose of most of the incoming pollutants and organic matter." (S.40) The plant would employ "a bubler process and not any kind of stirring-type motion . . . [so] there should be very little aerosol leaving the plant," (S.42) which is to be encircled by a solid fence.

9. Electric air blowers equipped with mufflers would be the only significant source of noise at the proposed plant, which would ordinarily be unmanned. If one blower failed, the other could run the plant itself.

10. A certified waste water treatment plant operator would be on site a half-hour each week day and for one hour each weekend. SFP has agreed to post a bond to guarantee maintenance of the plant for the six months' operation period a construction permit would authorize. (O.63)

11. The proposed plant would not "create a lot of odor if it's properly maintained." Id. The specifications call for a connection for an emergency portable generator and require that such a generator be "provide[d] for this plant. . . ." (S.43). The switch to emergency power would not be automatic, however.

12. A settling process is to follow extended aeration, yielding a clear water effluent and sludge. Licensed haulers would truck the sludge elsewhere for disposal.

13. One byproduct of extended aeration is nitrate, which might

166

exceed 12 milligrams per liter of effluent, if not treated, so an anoxic denitrification section has been specified which would reduce nitrate concentrations to below 12 milligrams per liter, possible to as low as 4 or 5 milligrams per liter.

14. Before leaving the plant, water would be chlorinated with a chlorinator designed to use a powder, calcium hypochlorite, and to provide one half part per million chlorine residual in the effluent entering the percolation ponds. A spare chlorine pump is to be on site.

15. The effluent would meet primary and secondary drinking water standards, would have 20 milligrams or less per liter of biochemical oxygen demand or, if more, no more than ten percent of the influent's biochemical oxygen demand, and total suspended solids would amount to 20 milligrams or less per liter. (S.294-195).

16. Half of the phosphorous entering the plant would become part of the sludge and half would leave in the effluent. Something like ten milligrams per liter of phosphorous would remain in the effluent discharged from the plant into the percolation ponds. (S.202).

17. Although technology for removing more phosphorous is available (S.298, O.170-171), SFP does not propose to employ it. Allen flocculation treatment followed by filtration could reduce phosphorous in the effluent to .4 milligrams per liter, but this would increase the cost of building the treatment plant by 30 to 40 percent; and operational costs would probably increase, as well, since it would be necessary to dispose of more sludge. (O.170-172). SFP did agree to accept a permit condition requiring it to monitor phosphorous levels in groundwater adjacent to the proposed plant. (O.63).

### Land Application

18. Three percolation ponds are planned with an aggregate area of 30,000 square feet. At capacity, the plant would be producing a gallon and a half of effluent a day for each square food of pond bottom in use. The ponds are designed in hopes that any two of them could handle the output of effluent, even with the plant at full capacity, leaving the third free for maintenance.

19. The percolation ponds would stand in the lakes' watershed, in an area "of minimal flooding," (S.30) albeit outside the 100-year flood plain. Santa Fe Lake, including Gator Cove, and Little Santa Fe Lake are fed by groundwater from the surficial aquifer. All effluent not percolating down to levels below the surficial aquifer or entering the atmosphere by evapotranspiration would reach the lake water one way or another sooner or later.

167

20. If percolation through the soils underneath the percolation ponds can occur at the rate SFP's application assumes, effluent would not travel overland into Lake Santa Fe except under unusually rainy conditions, which would dilute the effluent. Whether the planned percolation ponds would function as intended during ordinary weather conditions was not clear from the evidence, however.

21. In the event the ponds overflowed, which, on SFP's assumptions, could be expected to happen, if peak sewage flow coincided with weather more severe than a 25-year rainfall, effluent augmented by rainwater would rise to 179.87 NGVD (S.34), then overflow a series of emergency weirs connecting the ponds, flow through an outfall ditch, drain into a depression west of the ponds, enter a grassed roadside ditch, and eventually reach Lake Santa Fe "after about a half a mile or so of grass swales." (S.69).

22. Sheet flow and flow through an ungrassed gulley in the direction of Gator Cove (O.154) are other possible routes by which overflowing waters might reach the lake. (O.263). Since the facilities the plant is designed to serve are recreational, wet weather would discourage full use of the facilities and therefore full use of the water treatment system.

23. Effluent traveling over the surface into Gator Cove would wash over vegetation of various kinds.

> Plants, of course, do take up phosphorous, but they don't do it forever, and if you leave a plant system alone, it will come to a steady state in which there is no net storage of phosphorous in the plant material (O.166)

Whether by sheet flow or by traversing swales, overland flow would reach Gator Cove within hours.

24. Effluent traveling through the surficial aquifer would not reach the lake for at least five years (S.238-9). It could take as long as 45 years. (O.316). In the course of the effluent's subterranean passage, the soil would take up or adsorb phosphorous until its capacity to do so had been exhausted. In addition, interaction with certain chemicals found in the soil, primarily calcium, precipitates phosphorous dissolved in groundwater. As between adsorption and precipitation, the former is much more significant: "[W]ith a three-meter distance you can expect at least 70 to 80 percent removal of phosphorous just by a[d]sorption alone." (O.21).

25. Precipitated phosphorous does not return to solution, unless the soil chemistry changes. (O.19) Adsorption, however, is reversible,

168

although not entirely, because of the "hysteresis phenomenon." (O.19) Eventually, a kind of dynamic equilibrium obtains

> to do with the binding of the phosphorous to soil constituents, binding or precipitation of phosphorous.

> At some point . . . all of the binding sites become saturated . . . [and] the amount of phosphorous leaving, into the lake really, will be equal to the amount of phosphorous going into the system. When there is no more place to store the phosphorous in the ground, then the output is equal to the input and that is called the steady state. (O.161)

Although precipitation of phosphorous would not reach steady state under "conditions that render the phosphorous-containing compound insolu[ ]ble," (O.168) these conditions were not shown to exist now "much less . . . on into perpetuity." *Id.*

### Spring Seep

26. A third possible route by which the effluent might reach lake waters would begin with percolation through the sand, which is to be placed on grade and on top of which the percolation ponds are to be constructed. Underground, the effluent would move along the hydraulic gradient toward the lake unless an impeding geological formation (an aquiclude or aquitard) forced it above ground lakeward of the percolation ponds. In this event, the effluent would emerge as a man-made spring and complete its trip to Gator Cove, or directly to the lake, overland.

27. The evidence demonstrated that a spring seep of this kind was not unlikely. Relatively impermeable clayey soils occur in the vicinity. A more or less horizontal aquitard lies no deeper than four or five feet belo the site proposed for the percolation ponds. Conditions short of an actual outcropping of clayey sand could cause effluent mounding underground to reach the surface. Nor did the evidence show that an actual intersection between horizontal aquitard and sloping ground surface was unlikely. Such a geological impediment in the effluent's path would almost surely give rise to a spring seep between the pond site and the lakes.

28. In the case of the other percolation ponds in this part of the state that do not function properly, the problem is "[u]sually an impermeable layer much too close to the bottom of the pond," (S.179), according to Mr. Frey, manager of DER's Northeast District.

29. Phosphorous in effluent travelling by such a mixed route would be subject to biological uptake as well as adsorption and precipitation,

**169**

but again a "steady state" would eventually occur. On Dr. Bottcher's assumptions about the conductivity of the clayey sand (or sandy clay) lying underneath the topsoil, the effluent would accumulate as a mound of groundwater atop the clay unit, and seep to the surface in short order; and "after a matter of probably weeks and maybe months, it would be basically of the quality of the water inside of the percolation pond." (O.278).

### More Phosphorous in Gator Cove

30. The total annual phosphorous load from all existing sources "to the lake" has been estimated at 2,942 kilograms. Assuming an average effluent flow of 17,000 gallons per day from the proposed plant, "the total phosphorous load [from the proposed plant] will be 235 kilograms per annum," (O.16), according to Dr. Pollman, called by SFP as an expert in aquatic chemistry.

31. Even before any steady state condition was reached, 20.75 to 41.5 kilograms of phosphorous, or approximately one percent of the existing total, would reach the lake annually from the proposed plant, on the assumptions stated by Dr. Pollman at 0.22-23 (90 to 95 percent removal of phosphorous in the soils and average daily flow of 30,000 gallons).

32. Santa Fe Lake is more than two miles across and two miles long, and Little Santa Fe Lake, which may be viewed as an arm of Santa Fe Lake, is itself sizeable, with a shoreline exceeding two miles. But Gator Cove is approximately 200 yards by 100 yards with an opening into Santa Fe Lake only some 50 to 75 yards wide. (O.154). On a site visit, Dr. Parks observed "luxuriant growth of submerged plants" (O.154), including hydrilla, in Gator Cove.

33. If a one percent increase in phosphorous were diffused evenly throughout the more than eight square miles Santa Fe Lake covers, there is no reason to believe that it would effect measurable degradation of the quality of the water.

Some nutrients are beneficial, and the purpose of classifying a lake is to maintain a healthy, well-balanced population of fish and wildlife. It's hard to see how 1.4 percent increase would lower the ambient quality.

But . . . see page into Gator Cove, which is a much more confined place [100 by 200 yards] [would make it] quite probable that there would be a lowering of ambient water quality in the site . . . [R]educed dispersion . . . in this cove would allow . . . phosphorous to build up. (O.156)

170

Overland effluent flow to Gator Cove would increase concentrations of phosphorous there, with a consequent increase in the growth of aquatic plants, and the likely degradation of waters in the Cove, unless rapid and regular exchange of lake and cove waters dispersed the phosphorous widely, promptly upon its introduction.

34. Except for testimony that wind-driven waves sometimes stir up phosphorous laden sediments on the bottom, the record is silent on the movement of waters within and between Lake Santa Fe and Gator Cove. The record supports no inference that phosphorous reaching Gator Cove would be dispersed without causing eutrophic conditions significantly degrading the water in the Cove.

35. Neither does the record support the inference, however, that effluent moving underground into the lakes would enter Gator Cove. On this point, Dr. Bottcher testified:

> [T]he further away from the lake that you recharge water the further out under a lake that the water will be recharging into the lake; gives it a longer flow . . . it's going to migrate and come up somewhat out into the lake. . . . (O.281-2)

Phosphorous in the quantities the treatment plant would produce, if introduced "somewhat out into the lake" would probably not degrade water quality significantly, notwithstanding testimony to the contrary. (O.349, 354).

### Sands and Clays

36. DER gave notice of its intent to deny SFP's original application because SFP proposed to place the pond bottoms approximately two and a half feet above an observed groundwater table. Placement in such proximity to groundwater raised questions about the capacity of the ground to accept the effluent.

37. In its revised application, SFP proposed to place sand on the existing grade and construct percolation ponds on top of the sand. By elevating the pond bottoms, SFP would increase the distance between the observed groundwater table and pond bottoms to 5.2 feet (S.256, 257). This perched water table, which is seasonal, is attributable to clayey sand or sandy clay underlying the site proposed for the percolation ponds.

38. Between January 9, 1985, and January 17, 1985, "following a fairly dry antecedent period," (S. 229) Douglas F. Smith, the professional consulting engineer SFP retained to prepare the engineering report submitted in support of SFP's permit applications, conducted six

171

soil borings in the vicinity of the site proposed for the plant. One of the borings (TB 5) is in or on the edge of a proposed percolation pond and another (TB 4) is slightly to the north of the proposed pond site. Three (TB 1, 2, and 3) are east of the proposed pond site at distances ranging up to no more than 250 feet. The sixth is west of the proposed site in a natural depression. Mr. Smith conducted a seventh test boring under wetter conditions more than a year later a few feet north of TB 4.

39. Finally, on September 5, 1986, during the interim between hearing days, Mr. Smith used a Shelby tube to obtain a soil sample four to six feet below grade midway between TB 4 and TB 5.* The sites at which samples were taken are at ground elevations ranging from 173 to 178 feet above sea level.

40. From the original borings and by resort to reference works, Mr. Smith reached certain general conclusions: The top four feet or so at the proposed pond site consists of silty sandy, 17 percent silt and 83 percent quartz sand. This topsoil lies above a two-foot layer of clayey sand, 20 percent clay, 6 percent silt and 74 percent sand. Below the clayey sand lies a layer some eight feet thick of dense, silty sand, 23 percent silt, 7 percent clay and 70 percent sand, atop a one and one-half foot layer of clayey sand, separating loose, quartz sands going down 40 feet beneath the surface from what is above.

41. These formations "are very heterogeneous, in the sense of the position and occurrence of the clay layers or the sandy layers . . . ," (O.230) and all occur within the surficial aquifer. "There are layers of clay within it, and so perched water tables are rather common."

---

* Petitioner learned of this final test minutes before the hearing concluded at approximately ten o'clock at night, and objected to introduction of results of the test on grounds of surprise. (O.412) The objection was overruled. (O.414) Counsel for petitioner then requested that petitioner's "experts [be afforded] an opportunity to review the [new] data and comment on it in writing." (O.416) Counsel for SFP expressed concern "about the ability to cross-examine Mr. Bottcher on rebuttal," (O.437) but it was ultimately agreed that petitioner's expert's written comments would be received, subject to SFP's right to cross-examine by setting down the expert for deposition, with the understanding that the deposition would become part of the record, if taken; but that SFP's counsel would also "have the option of foregoing that cross examination." (O.439)

Dr. Bottcher made written comments which were forwarded to the hearing officer and the parties. Neither SFP nor DER elected to depose Dr. Bottcher. If Dr. Bottcher's statement had been under oath, it might not be hearsay, because of the opportunity that existed to cross examine him. But the written comments are not sworn and do constitute hearsay. They have not, accordingly, been used in themselves to support a finding of fact. See *Harris v. Game and Fresh Water Fish Commission*, 495 So.2d 806 (Fla. 1st DCA 1986). But see *Tri-State Systems, Inc. v. Department of Transportation*, 500 So.2d 212, 215 (Fla. 1st DCA 1986).

172

(O.225). In March of 1986, the regional water table was some 17 feet down. SFP Exhibit 1B. Below the surficial aquifer lie the Hawthorne formation and, at a depth of 110 feet, the limestone of the Floridan aquifer. The soils above the Hawthorne formation are not consolidated. (S.254, 255).

## Conductivity Measurements

42. The applicant offered no test results indicating the composition or conductivity of soils lying between the easternmost test boring and Gator Cove, some 1,200 feet distant. No tests were done to determine the conductivity of the deeper layer of clayey sand beneath the site proposed for the ponds.

43. Tests of a sample of the topsoil in TB 7 indicated horizontal permeability of 38.7 feet per day and vertical permeability of six feet per day. On the basis of an earlier test of topsoil in TB 3, "hydraulic conductivity of the surface soils was measured to be 8.2 feet per day. . . ." SFP's Exhibit No. 1B. From this measurement, vertical hydraulic conductivity was conservatively estimated at .82 feet (9.84 inches) per day. *Id.* The design application rate, 2.41 inches per day, is approximately 25 percent of 9.84 inches per day. *Id.*

44. The initial test done on a sample of the clayey sand, which lay beneath the topsoil at depths of 3.5 to 5.5 feet, indicated a permeability of 0.0001 feet per day. Thereafter Mr. Smith did other testing and "made some general assumptions" (S.235) and conduced that "an area-wide permeability of this clayey sand would be more on the order of 0.0144 feet per day." (S.234) Still later a test of the sample taken during the hearing recess indicated hydraulic conductivity of 0.11 feet per day. SFP's Exhibit No. 10.

45. The more than thousandfold increase in measured conductivity between the first laboratory analysis and the second is attributable in some degree to the different proportions of fines found in the two samples. The soil conductivity test results depend not only on the composition of the sample, but also on how wet the sample was before testing began.

## Vertical Conductivity Inferred

46. On March 6, 1986, ground water was obsered on the site about two and a half feet below the surface. SFP's expert, Mr. Smith, concluded that it was "essentially a 1.5 foot water table, perched water table over the clay." (O.422). There was, however, groundwater below, as well as above, the clay. On March 12, 1986, the water table at this point had fallen six inches.

173

47. In the preceding month rainfall of 5.9 inches had been measured in the vicinity, after 5.1 inches had been measured in January of 1986, but in November and December of 1985 "there was a total of 0.6 inches of rainfall." (O.421). Later in the year, notwithstanding typically wet summer weather, no water table was measured at this point.

48. From this Mr. Smith concluded that, once the clayey sand layer is wetted to the point of saturation, conductivity increases dramatically. If that were the case, a more or less steady stream of effluent could serve to keep the clayey sand wetted and percolation at design rates should not be a problem.

49. But Dr. Bottcher, the hydrologist and soil physicist called as a witness for the Association, testified that the six-inch drop over six days could be attributed, in large part, to evapotranspiration.

50. He rejected the hypothesis that the clayey sand's conductivity increased dramatically with saturation, since "the actual water table was observed . . . about three weeks after the very heavy rainfall had stopped" (O.290) and had probably been present for at least a month; and because the soil survey for Alachua County reports that perched water tables ordinarily persist for two months (O.227) in this type of soil. Certain soils' hydraulic conductivity does diminish with desiccation, but such soils usually regain their accustomed conductivity within hours of rewetting. Dr. Bottcher rejected as unrealistically optimistic the assumption SFP's expert made about the conductivity of the clayey sand on grounds that "the conductivity that . . . [SFP] used, if you went out there you couldn't perch a water table for a month." (O.277). In these respects, Dr. Bottcher's testimony at hearing has been credited.

51. In the opinion of the geologist who testified on behalf of the Association, Dr. Randazzo, a minimum of seven or eight additional augur borings in "definitive patterns to the northeast and to the northwest" (O.240) to depths of 15 to 20 feet, with measurements within each augur boring every two feet, are necessary to determine "how permeable the soils are and how fast the waters would move through them." (O.240). This testimony and the testimony of the soil physicist and others to the same general effect have been credited, and Mr. Smith's testimony that no further testing is indicated has been rejected.

### Wet Ground

52. In the expert opinion of a geologist who testified at hearing, "it is reasonable to assume that saturation conditions of the surficial aquifer

174

in this area can be achieved," (O.238) even without adding effluent from a wastewater treatment plant.

53. The evidence that soils in the vicinity of the site have a limited capacity to percolate water came not only from engineers and scientists. Charles S. Humphries, the owner of the property 150 feet from the proposed percolation site, "put a fence post line . . . every ten feet, and every ten feet [he] hit clay." (O.372). Three quarters of an inch of rain results in waters standing overnight in neighboring pastures. In parts of the same pastures, rain from a front moving through "will stay for a week or so." (O.373). It is apparent that the area cannot percolate all the rainfall it receives. This is the explanation for the gully leading down toward Gator Cove. Six-feet deep (O.377), "the gully is a result of natural surface runoff." (O.263).

## CONCLUSIONS OF LAW

When DER transmitted the Association's petition for hearing, in accordance with Section 120.57(1)(b)3, Florida Statutes (1986 Supp.), the Division of Administration Hearings assumed jurisdiction of formal administrative proceedings on SFP's application for a permit to construct a wastewater treatment plant.

### Burden on Applicant

As to the applicant, SFP has the burden to prove entitlement to the permit. The courts view it "as fundamental that an applicant for a license or permit carries 'the ultimate burden of persuasion' of entitlement through all proceedings, of whatever nature, until such time as final action has been taken by the agency." *Department of Transportation v. J.W.C. Co., Inc.,* 396 So.2d 778, 787 (Fla. 1st DCA 1981). See *Zemour, Inc. v. State Division of Beverage,* 347 So.2d 1102 (Fla. 1st DCA 1977) (lack of moral character found "from evidence submitted by the applicant"). See generally *Balino v. Department of Health and Rehabilitative Services,* 348 So.2d 349 (Fla. 1st DCA 1977).

SFP's burden of proof is set out in Rule 17-4.070, Florida Administrative Code, which authorizes DER to issue construction permits "only if the applicant affirmatively provides the Department with reasonable assurance based on plans, test results and other information, that the construction . . . of the installation will not . . . cause pollution in contravention of Department standards or rules." Rule 17-4.070(1), Florida Administrative Code. Subsection (2) of the same rule authorizes DER to issue construction permits only when DER determines provision has been made to "abate or prevent pollution to the degree that will comply with . . . [DER] standards or rules . . ."

These rule requirements parallel the statutory requirements set out in Section 403.087(4), Florida Statutes (1986 Supp.).

## Outstanding Florida Waters

Pertinent substantive rules appear in Chapter 17-6, Florida Administrative Code. Rule 17-6.040(1) and (4)(q), Florida Administrative Code, incorporate by reference the "Land Application of Domestic Wastewater Effluent in Florida" and make compliance with criteria in this manual mandatory. Since the evidence showed that effluent from the proposed plant would enter Outstanding Florida Waters under overflow conditions and did not disprove the likelihood that effluent would enter Outstanding Florida Waters under normal weather conditions, Rule 17-4.242, Florida Administrative Code, also applies.

## Non-Polluting Design

A wastewater treatment plant with percolation ponds differs considerably from a "statutory installation[ ] which will not discharge waste into waters within the state." *Grove Isle v. Department of Environmental Regulation,* 454 So.2d 571, 574 (Fla. 1st DCA 1984) (footnote omitted). Such treatment plants ordinarily discharge waste into waters within the state, usually groundwaters. In proceedings on an application for a permit to construct a wastewater treatment plant, the applicant must give reasonable assurances not only that the act of construction will not offend environmental standards, but also that the plant, if constructed as designed, will not, when operated "cause pollution in contravention of Department . . . rules." Rule 17-4.070(1), Florida Administrative Code.

In the present case, there has been no evidence one way or another, on what environmental impacts, if any, the activities associated with construction would entail. The question the parties have litigated is what will happen, if the plant is built as proposed, when it begins to operate.

Construction permits ordinarily, as here, authorize operation for some trial period, so that the conditions of an ensuing operating permit can be drawn on the basis of actual experience, but the effects of operation are also the appropriate focus in a construction permit case like this one. Any other approach would be an "unconscionable waste of resources." *del Campo v. State Department of Environmental Regulation,* 452 So.2d 1004, 1006 (Fla. 1st DCA 1984). The issues in a construction permit proceeding are, of course, more limited than those in an operation permit proceeding, in which questions unrelated to a project's physical design may also be germane.

176

## Burden Not Met

The applicant has not sustained its burden in the present case. SFP has not given reasonable assurance that the site it has chosen for percolation ponds meets DER requirements designed to ensure proper percolation. These requirements are set out in the Land Application of Domestic Wastewater Effluent in Florida (Land Application Manual), which has the force of law, Rule 17-6.040(1) and (4)(q), Florida Administrative Code, and provides:

> The design hydraulic loading (and application) rate shall be related to the hydraulic conductivity and transmissivity of the geologic formations at the project site which shall be evaluated in-depth by the permittee, with assistance from organizations or individuals qualified by training or experience in soil science, geology and hydrology.
>
> . . . . . . . . . . . .
>
> The hydraulic loading rate shall be related to the · clear water saturated vertical hydraulic conductivity for the most restrictive layer in the unconsolidated medium underlying the site; . . .
>
> application rates . . . shall not exceed 25% of the documented vertical hydraulic conductivity, as described above . . . At 17.
>
> Hydrogeologic data necessary· to evaluate the capability of the proposed project to perform successfully at the site on a long-term basis shall be provided . . . includ[ing] geophysical information concerning . . . the identification (with applicable geologic sections), extent or continuity, and hydrologic characterization of aquifers and confining zones underlying the sites. . . . At 42.

The Land Application Manual limits design application rates to a specified fraction "of the documented vertical hydraulic conductivity of the most restrictive layer in the unconsolidated medium" beneath the site.

The record is devoid of quantiative evidence of the vertical conductivity of the deeper clay unit in the surficial aquifer, even though the perched water table observed in March of 1986 extended below the upper clay unit. Slice the deeper clayey layer may be more restrictive than the clayey sand lying some four or five feet beneath the surface, SFP has failed to give reasonable assurances that its design application rate meets DER requirements.

Even on the assumption, which the evidence fails to establish, that the clay unit nearer the surface is "the most restrictive layer in the unconsolidated medium," SFP has failed to give reasonable assurances

**177**

that its application rate meets the Land Application Manual criteria. The evidence showed clearly that SFP chose as the design application rate a figure more closely approximating 25 percent of the estimated vertical hydraulic conductivity not of the most restrictive, but of the least restrictive layer in the unconsolidated medium underlying the site. The design application rate SFP chose (2.41 inches or .201 feet per day) exceeds by more than half the highest vertical conductivity value anybody measured for any sample of the clayey sand (1.23 inches or .11 feet per day), and the highest measured value is 1100 times greater than the first measured value.

The inferences Mr. Smith drew from groundwater measurements in March of 1986, concerning the vertical conductivity of the clay unit were not warranted, according to the weight of the evidence. Such inferences do not, in any event, amount to "documented" values.

### Phosphorous Pollution Following Faulty Percolation

Upwelling effluent reaching the surface of the ground would flow into the lake, constituting a discharge into Outstanding Florida Waters, whether it reached the lake as sheet flow or, collected in swales, as a stream. The evidence did not give reasonable assurances that a discharge of this kind would not significantly degrade Gator Cove. Gator Cove, no less than any other part of Lake Santa Fe, has been designated Outstanding Florida Waters.

Even though any such discharges would initially be largely free of phosphorous, the capacity of the soils for adsorption and of the vegetation for biological uptake is limited. The purpose of Rule 17-4.242, Florida Administrative Code, is to afford special protection to Outstanding Florida Waters in order to avert significant degradation not for a mere six months, but for six generations and beyond.

The applicant did not prove facts which showed the objectors' spring seep hypothesis, itself predicated on substantial, quantiative evidence of record, to be unfounded. See *Department of Transportation v. J.W.C. Company, Inc.,* 396 So.2d 778 (Fla. 1st DCA 1981). As far as can be told from this record, it is not unlikely that the proposed water treatment plant would indeed result in effluent seeping to the surface of the ground down slope from the percolation ponds and flowing overland to Gator Cove, ultimately inducing eutrophication of the Cove, in violation of the legal prohibition against significant degradation of waters designated Outstanding Florida Waters.

It is, accordingly,

RECOMMENDED:

178

That DER deny SFP's application for a permit to construct a wastewater treatment and disposal plant.

DONE and ENTERED this 8th day of April, 1987, at Tallahassee, Florida.